UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| SPURWINK SERVICES, INC., <br><br> Plaintiff, <br><br> v. <br><br> JOHN DOE, JANE DOE, TOMMY DOE, LEWISTON PUBLIC SCHOOLS, MAINE DEPARTMENT OF EDUCATION, PENDER MAKIN, in her official capacity as Maine Department of Education Commissioner, MELANIE FRAZEK, in her official capacity as Maine Department of Education Hearing Officer, <br><br> Defendants. | Case No. 2:25-cv-00026-NT |

**COMPLAINT**
**(Declaratory and Injunctive Relief Requested)**

Plaintiff Spurwink Services, Inc. ("Spurwink") brings this complaint against Defendants John Doe, Jane Doe, the parents and caregivers of Tommy Doe, Lewiston Public Schools ("LPS"), the Maine Department of Education ("MDOE"), Pender Makin (in her official capacity as MDOE Commissioner), and Melanie Frazek (in her official capacity as MDOE Hearing Officer) as follows:

**INTRODUCTION**

1.      This case highlights the untenable situation created for private schools, like those operated by Spurwink, following the MDOE's incorrect interpretation that certain obligations under the Individuals with Disabilities Education Act ("IDEA") apply to private schools. Under the IDEA, public schools receive federal funding to educate students with disabilities and, in exchange, must recognize certain rights conferred to those students. The obligations that are the

subject of this case that MDOE purports to impose on private schools include the IDEA's obligation of public schools to provide a free and appropriate public education ("FAPE") to students and a so-called "stay put" obligation to keep the student in their then-current placement pending the individualized education plan ("IEP") process. As this case illustrates, the untenable situation occurs when students need a more intensive level of supervision and treatment than the school can safely provide. Where, as here, the student harms himself and other students, and repeatedly engages in physical aggression including frequently biting employees through protective clothing or so severely as to tear through muscle tissue, cause permanent scarring, and in one case, causing the employee to be referred to a plastic surgeon for a consultation on the employee's injuries, Spurwink must act to protect both the student and its staff.

2. For the student to move to a facility providing a more intensive level of treatment, the student's IEP team must determine whether a change in placement is warranted. The sending public school controls the outcome of the IEP process, and therefore school placement, for a student with disabilities. The sending public school also is the entity responsible for identifying another placement when the student's needs are no longer being met.

3. Where, as here, despite the overwhelming evidence and  As a result, the public school is under significant pressure, often including budgetary pressure, to maintain a student's current placement.

4. Under its plain terms, both the IDEA and the state implementing regulations—the Maine Unified Special Education Regulation, Birth to Age Twenty-Two ("MUSER")— exclusively apply to public agencies. The terms are not defined to include private schools. Contrary to those plain terms, the MDOE Hearing Officer in this case has entered an Order (the "Stay Put Order") requiring Spurwink to readmit the student, Tommy Doe, citing MDOE guidance

that the IDEA applies to schools like those operated by Spurwink.[1] By issuing the Stay Put Order as applied to Spurwink, rather than the local educational agency (i.e., LPS), MDOE has exceeded its authority and created the untenable situation in which Spurwink now finds itself.

5. Spurwink now comes to this Court seeking an order enjoining MDOE from putting at risk the safety of the student and Spurwink's staff and declaring the limits of the IDEA and the MUSER, consistent with the consensus of other courts that have reviewed this legal issue.

## THE PARTIES

6. Plaintiff, Spurwink, is a Maine non-profit corporation with its principal place of business in Portland, Maine.

7. Defendants John Doe and Jane Doe are the parents and legal guardians of the student Tommy Doe. They are residents of the State of Maine.

8. Defendant LPS is the local educational agency ("LEA") and school administrative unit ("SAU") responsible for providing a public education to the age-eligible residents of Lewiston, Maine and FAPE to eligible students.

9. Defendant MDOE is Maine's state educational agency ("SEA").

10. Defendant Pender Makin is the MDOE Commissioner, and in that role and by the authority of title 20-A, chapters 301 and 303 of the Maine Revised Statutes is responsible for implementing the IDEA and its required procedures, including but not limited to MDOE due process hearing proceedings. *See, e.g.*, Me. Rev. Stat. Ann. tit. 20-A, §§ 7005, 7204, 7207-B, 7209.

11. Defendant Melanie Frazek serves as an MDOE Hearing Officer, and in that role and by the authority of section XVI of the MUSER is responsible for presiding over MDOE due

---

[1] Spurwink was not a party to MDOE's due process hearing proceeding and MDOE has acknowledged that Spurwink cannot be a proper party under IDEA and Maine law.

process hearing proceedings and issuing final decisions and other relief related to those hearings, including but not limited to stay put orders.

12. Defendants Makin and Frazek are collectively referred to as the "MDOE Officials."

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367, in that this is a civil action arising under 42 U.S.C. § 1983 and 20 U.S.C. § 1400 *et seq*.

14. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

15. Venue in the United States District Court for the District of Maine is proper pursuant to 28 U.S.C. § 1391(a) and (b) because all Defendants are residents of Maine and the events giving rise to the claims occurred in Maine.

## FACTS COMMON TO ALL COUNTS

### Background

16. Tommy Doe is a nineteen-year-old student. He resides in Lewiston and has been identified as a student eligible to receive special education and related services under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. ("IDEA").

17. Tommy Doe has been diagnosed with Autism Spectrum Disorder, Pica Disorder, extensive allergies, and a seizure disorder. Tommy is non-verbal, and he presents symptoms of these disorders at times through severe aggression toward others, biting, and other dangerous self-injurious behavior.

18. Spurwink is one of Maine's largest behavioral health providers and has provided behavioral health and education services for children, adults, and families throughout the state of

Maine for over sixty (60) years. Spurwink provides services to individuals affected by mental health challenges and developmental disabilities.

19. Spurwink has nearly thirty (30) active locations serving children and adults throughout Maine.

20. Spurwink operates a residential campus for children, adult group homes, and adult nursing homes. Spurwink also operates four special purpose private schools ("SPPS") that are licensed by the State of Maine to provide day treatment services for students affected by mental health challenges and developmental disabilities.

21. One of Spurwink's SPPSs is Spurwink Lewiston Day Treatment ("Spurwink LDT"), which is located in Lewiston.

22. Tommy Doe attended Spurwink LDT from January 5, 2023, to November 8, 2024.

23. LPS is the LEA responsible for implementing Maine's regulatory requirements for IEPs for students residing within its geographic jurisdiction.

24. MDOE is the SEA in the State of Maine, responsible for overseeing the execution of Maine's duties under the IDEA.

**Tommy Doe's Placement at Spurwink**

25. On or about January 5, 2023, Tommy Doe's school district at the time, Sheepscot Valley Regional School Unit 12 ("RSU 12"), referred Tommy to Spurwink LDT for specialized instruction and behavioral skills as well as speech and occupational therapy.

26. On January 5, 2023, Spurwink entered into a contract with Jane Doe and RSU 12 regarding the "care, custody, education and treatment of [Tommy Doe] while in the Day Treatment Program at Spurwink" ("Contract"). Ex. A to Ex. 1 to Motion for Prelim. Inj., Declaration of Garry Kenyon ("Kenyon Decl."), at 1.

27. As a condition of Tommy Doe's placement at Spurwink LDT, Spurwink required Jane Doe and RSU 12 to enter into the Contract.

28. The Contract contained the following pertinent provision providing for the discharge of Tommy Doe from Spurwink LDT:

> **8. TERMINATION OF PLACEMENT**
>
> Spurwink may terminate a placement at any time if it believes that such termination is in the best interest of the client or Spurwink. Notice of such termination shall be promptly given to the parents/legal guardians and referring agency. The party having legal custody and control of the client, whether parents/legal guardians or referring agency, may terminate the placement at any time.
>
> All parties agree to cooperate to the extent possible in arranging for such termination and transfers to minimize disruptive effects on the client.

Exhibit A to Kenyon Decl., at 4.

29. In July 2024, RSU 12's rights and obligations under the Contract were assigned to LPS.

30. Throughout his education at LPS, averaging approximately once every two weeks, Tommy Doe experienced an episode in which he engaged in dangerous behavior, primarily consisting of self-injurious behavior and biting, hitting, or kicking of staff members.

31. Tommy's self-injury behaviors while at Spurwink LDT include slamming his head into a doorway to the point of breaking thick safety glass, breaking a car windshield and car windows, slamming his head against walls and the floor, and hitting himself in the face with an aluminum can; and although staff limited his interactions with other students, on one occasion, kicking another student.

32. Tommy has repeatedly hit, kicked, and bitten staff members, causing substantial injury, including biting staff to the point of tearing through muscle tissue and causing fingernails

to fall off, biting a van driver in the elbow causing him to bleed while he was driving on I-95 northbound, and kicking and hitting staff repeatedly.

33. Although staff took numerous, evolving, and very extensive preventive measures to try to prevent injury, they could not avoid Tommy causing injury during a biting episode.

34. For example, staff were required to wear thick protective gloves at all times while working with Tommy.

35. However, Tommy became increasingly adept at tearing off staff members' gloves and could bite hard enough that he would cause injury through the gloves.

36. Staff also extensively reviewed Tommy's episodes to attempt to identify potential triggers or improve responses to minimize the potential for injury or harm.

37. One of the primary triggers identified is when Tommy is told "no" to a requested activity, or is directed to perform a task or activity that he does not like. As a result and by necessity, Tommy's curriculum and activities at Spurwink LDT became almost entirely self-directed. Tommy's primary activities included laying on his mat watching videos on his iPad, eating meals, and going outside to the swings.

38. Staff also identified that the safest response to an episode was to exit the room and close the door behind them, leaving Tommy to calm himself. As time progressed and Tommy continued to experience significant episodes, staff were instructed to stand by the door, not place themselves near his body, and to have quick access to the door exit at all times.

39. Spurwink LDT also increased Tommy's staffing ratio from 1:1 to 2:1, and eventually to a 3:1 ratio in August 2024.

40. It was also in August of 2024 that Spurwink LDT began informing LPS that it was not an appropriate placement for Tommy and that they would need to terminate services.

41. Moreover, the Board-Certified Behavior Analyst provided by LPS has only been able to observe Tommy Doe from outside of the classroom as the Spurwink team did not feel they could ensure safety with a non-familiar staff in the classroom due the the intensity of Tommy Doe's violent behaviors and the safety risks they pose to Tommy Doe and Spurwink staff.

42. Ultimately, in or around October 2024, Spurwink LDT identified that it was not an appropriate placement for Tommy due to the safety issues and Tommy's lack of ability to participate meaningfully in the programs or activities.

**The November 1, 2024 Incident**

43. On November 1, 2024, Tommy Doe exhibited behaviors that made it clear that Spurwink LDT was not an appropriate placement for Tommy Doe and accelerated the time frame for termination of services for Tommy.

44. Specifically, on Friday, November 1, 2024, Tommy Doe experienced a violent biting episode while outside using the swings.

45. Tommy bit three (3) of the four (4) Spurwink LDT responding staff members so severely as to tear through the muscle tissue of one employee and to cause significant injury by biting through another staff member's protective gloves.

46. All three (3) staff were required to receive emergency medical treatment at an urgent care facility.

47. On the afternoon of November 1, Spurwink LDT notified Jane Doe that Tommy Doe was being suspended through the IEP meeting on Friday, November 8, 2024.

48. Following the November 1 incident, Spurwink LDT staff met and determined it could no longer safely allow Tommy Doe to use the swings outside, which would be very difficult for Tommy to understand.

49. Given the prior decision to terminate services in December, Spurwink LDT determined that it was appropriate to accelerate the time frame for termination, and on Monday, November 4, 2024, Spurwink informed Tommy Doe's parents that at the IEP meeting on Friday, November 8, 2024 they would recommend termination to the team because they could not safely staff him.

50. Spurwink LDT's staff then spoke with LPS on November 4, 2024, to inform the district that Spurwink would be recommending the discharge at the November 8 IEP meeting.

51. On November 7, 2024, Spurwink met with LPS and its legal counsel and reiterated to them that Spurwink would be recommending discharge of Tommy Doe at the IEP meeting the next day because it was no longer able to safely care for Tommy.

**The November 8th IEP Meeting**

52. On November 8, 2024, Tommy Doe's IEP meeting was held, attended by LPS' lawyer and staff, John and Jane Doe, representatives from Spurwink, and Tommy Doe's advocate.

53. LPS indicated that it was only available for one hour for this IEP meeting.

54. In this IEP meeting, Spurwink confirmed that it intended to discharge Tommy Doe.

55. The discussion regarding the discharge was very contentious and Tommy Doe's advocate's behavior prevented any further productive discussion.

56. As a result, LPS unilaterally ended the IEP meeting.

57. Despite knowing that Spurwink intended to discharge Tommy Doe in advance of the November 8th IEP meeting, LPS did not provide a plan to transition Tommy Doe to another provider.

**The Does' Due Process Hearing Request**

58. After the November 8th IEP meeting, Tommy Doe's guardians filed a Due Process Hearing Request ("Hearing Request") arguing that LPS' and Spurwink's "unilateral action to discharge [Tommy Doe] from his placement without use of the IEP process violated his rights under state and federal law, both procedurally and substantively." Exhibit A, at 4.

59. In the Hearing Request, Tommy Doe's guardians also sought a "continuation of his educational programming and placement at Spurwink Lewiston Day Treatment per his IEP." Tommy Doe's guardians also invoked Tommy Doe's "stay-put rights and, in the event of non-compliance by Lewiston and Spurwink, they [requested] an immediate order permitting him to continue his placement at Spurwink Lewiston Day Treatment during the pendency of these proceedings." Exhibit A, at 4.

60. On November 15, 2024, Tommy Doe's guardians filed a Motion for Maintenance of Placement (Enforcement of "Stay Put" Relief) seeking an order that reverses Spurwink's decision to discharge Tommy Doe and requires Spurwink to maintain his placement during the pendency of the proceedings. Exhibit B.

61. At 4:30 p.m. on November 15, 2023, LPS sent a letter to Spurwink requesting that Spurwink allow Tommy Doe to return to its facilities and implement his current IEP because the IEP team had not amended Tommy Doe's placement or agreed to remove him from Spurwink. The letter also stated that LPS did not agree with the decision to discharge Tommy Doe. Exhibit C.

62. The letter also incorrectly stated that the IDEA required private schools, such as Spurwink, to comply with "stay put" requirements and that if Spurwink would not allow Tommy

- 10 -

Doe to return to its Spurwink LDT, then LPS would file a motion to join Spurwink in the pending due process hearing proceedings and seek stay put through that process. Exhibit C.

63. On November 21, 2024, a MDOE Hearing Officer issued an order (the "Stay Put Order") stating that (1) Tommy Doe was unilaterally discharged on November 8, 2024, from Spurwink LDT and that during the November 8th IEP meeting there was no decision on alternative educational programming for Tommy Doe and no IEP team determination of an alternative placement; (2) the discharge from Spurwink LDT was a change in placement in violation of the IEP process; (3) the Hearing Officer granted LPS until November 25, 2024, to respond to Tommy Doe's guardians' Motion for Maintenance of Placement (Stay Put) but after further consideration and review of LPS's November 15, 2024 letter to Spurwink, in which LPS agreed with Tommy Doe's guardians that Tommy Doe was entitled to remain in his current IEP educational placement, it was not necessary that LPS respond; and (4) the Hearing Officer was granting the guardians' motion, reversing Spurwink's discharge decision, and ordering that Tommy Doe shall resume his IEP placement at Spurwink LDT immediately. Exhibit D.

64. The Stay Put Order erroneously relied on MDOE's Administrative Letter dated November 24, 2021, which seeks to impose obligations on SPPSs that do not comply with applicable law. Exhibit D.

65. As a private school, Spurwink was not a party to the due process hearing proceedings and, thus, has no means to advocate for a change of placement or challenge LPS's failure to provide an alternative placement for Tommy Doe once Spurwink advised Tommy Doe's guardians and LPS that it could not maintain the safety of Tommy Doe or its staff any longer.

66. On December 20, 2024, LPS filed a motion to dismiss the due process hearing proceedings against LPS.

67. On January 17, 2025, the MDOE Hearing Officer issued a decision that granted LPS's motion to dismiss in part. Exhibit E. In the decision, the MDOE Hearing Officer concluded that LPS "met its administrative responsibilities as the sending school administrative unit pursuant to MUSER § IX.3.I," but that LPS would have to "ensure Student is provided with compensatory education pursuant to the current IEP for services not received" since November 8, 2024. Exhibit E, at 6. The MDOE Hearing Officer also "opine[d] *in dicta*" that MDOE "could immediately pull Spurwink's status as an approved special purpose private school" and encouraged the parties to file a breach of contract claim against Spurwink. Exhibit E, at 4-5 (emphasis in original).

68. The Hearing Officer made numerous factual findings based on a lack of evidence or incomplete evidence provided by Lewiston and the Does even though Spurwink had no opportunity to submit its own evidence to defend itself against the inaccurate claims made against it, as it has not been permitted to be party to the proceeding. Exhibit E, at 4-5.

69. In a second administrative track, Jane Doe filed a State Complaint Investigation Request Form on November 22, 2024, requesting that MDOE seek to have Spurwink "immediately comply with its legal responsibilities as a state-approved special purpose private school or lose its state approval to supply IEP services to Maine students with disabilities" (the "State Complaint Process"). Exhibit F. On January 21, 2025, MDOE notified the Does, LPS, and Spurwink that (1) MDOE "closed" the "state complaint investigation" because of the MDOE Hearing Officer's decision on LPS's motion to dismiss, citing the regulation that makes the orders in a due process proceeding *with the same parties* binding on the State Complaint Process, and stating (2) "[f]urther administrative guidance will follow." Exhibit G.

**COUNT I**
**(Declaratory Judgment – The MDOE Administrative Proceedings Violate Spurwink's Due Process Rights, 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. § 1983)**
**(As to Defendants MDOE, Pender Makin, in her official capacity as MDOE Commissioner, and Melanie Frazek, in her official capacity as MDOE Hearing Officer)**

70. Spurwink repeats and realleges paragraphs 1 through 63, hereof as if fully set forth herein.

71. An actual controversy exists between Spurwink, MDOE, and the MDOE Officials as contemplated under 28 U.S.C. §§ 2201, 2202.

72. Specifically, there exists an actual, substantial legal controversy between Plaintiff, the MDOE, and the MDOE Officials as to whether the MDOE administrative due process proceedings violate Spurwink's constitutional rights.

73. The Constitution of the United States, U.S. Const. amend. XIV, § 1, and the Constitution of the State of Maine, Me. Const. Art. 1, § 6-A, guarantee to every person the rights to substantive and procedural due process of law.

74. The MDOE administrative proceedings violate Spurwink's rights under the Due Process Clauses of the United States and Maine Constitutions.

75. The MDOE Officials, on behalf of MDOE and acting in their official capacities, have implemented, carried out, or overseen the MDOE administrative proceedings.

76. The MDOE administrative proceedings imminently threaten to deprive Spurwink of its constitutionally protected property interest by threatening to take away Spurwink's state license without providing Spurwink with an opportunity to be heard in a meaningful manner.

77. In violating Spurwink's procedural due process rights, MDOE and the MDOE Officials act under the color of state law because Maine's legislature requires MDOE to implement the IDEA. Me. Rev. Stat. Ann. tit. 20-A, § 7006. MDOE has implemented the IDEA

and its required procedures, in part, through the MDOE administrative proceedings that the MDOE Officials implement, carry out, or oversee.

78. Accordingly, the MDOE administrative proceedings are developed and executed under the color of state law, and the MDOE Officials are now carrying out those proceedings against Spurwink.

79. Through the MDOE administrative proceedings, MDOE and the MDOE Officials are depriving Spurwink of its constitutional rights in violation of 42 U.S.C § 1983.

80. Spurwink's violated due process rights are clearly established constitutional rights of which a reasonable person would be aware.

## COUNT II
### (Declaratory Judgment – The IDEA,  and Its Stay Put Provisions Do Not Apply to Spurwink, 28 U.S.C. §§ 2201, 2202 and 20 U.S.C. § 1400 *et seq.*)
### (As to all Defendants)

81. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 74 as if fully set forth herein.

82. An actual controversy exists between Spurwink and Defendants as contemplated under 28 U.S.C. §§ 2201, 2202.

83. Specifically, there exists an actual, substantial legal controversy between Plaintiff and Defendant MDOE as to (1) whether Spurwink owes a duty to provide FAPE to the student; (2) whether Spurwink is bound by the stay-put provision of the IDEA, 20 U.S.C. § 1415(j); (3) whether MDOE has the authority to issue an order in a due process hearing proceeding that purports to govern Spurwink in the Stay Put Order; and (4) whether MDOE has any authority to enforce the Stay Put Order.

84. Although Spurwink no longer provides services to the student, an actual controversy remains between Spurwink and all Defendants, including John Doe and Jane Doe. The legal guardians could bring a civil action in this Court to attempt to enforce administrative decisions. *See* 20 U.S.C. § 1415(i)(2).

85. The MDOE Hearing Officer Melanie Frazek, Esq. has issued the Stay Put Order purporting to require Spurwink to readmit the student under the IDEA's stay-put provision. Under the IDEA, the federal regulations, and Maine's implementing regulations (MUSER), the stay-put provisions only apply to state or local public agencies. *See* 20 U.S.C. § 1415(a), (j); 34 C.F.R. § 300.518; Me. Rev. Stat. Ann. tit. 20-A, § 7006; 05-071 C.M.R Ch. 101, §§ I, XV.

86. The IDEA expressly contemplates that children will be placed in private schools. The statute obligates the State, not the private school, to ensure that such children "are provided special education and related services, in accordance with an individualized education program[.]" 20 U.S.C. §1412(a)(10)(B)(i).

87. The IDEA's implementing regulations apply only to the State and other public agencies, not to private schools that accept placements from public agencies.

88. In this case, MDOE exceeded its lawful authority under the IDEA and implementing state regulations (MUSER) by issuing the Stay Put Order and Order on the Motion to Dismiss concluding that Spurwink was subject to the stay-put obligations.

89. MDOE threatens to further exceed its lawful authority in seeking to enforce the Stay Put Order and threatening to revoke Spurwink's approval as a SPPS.

90. As such, Plaintiff is entitled to a declaration that the IDEA's stay-put and FAPE requirements do not apply to Spurwink.

## COUNT III
## (Injunctive Relief Preventing Enforcement of MDOE's Stay-Put Order)
## (As to all Defendants)

91. Spurwink repeats and realleges the allegations set forth in paragraphs 1 through 84 as if fully set forth herein.

92. MDOE has admitted that Spurwink is not a proper party to the due process hearing proceeding regarding the student.

93. Given that Spurwink is not a party to the due process hearing proceedings, and with other administrative remedies futile or inadequate, Plaintiff seeks an order from this Court enjoining enforcement of the Stay Put Order, or any other order purporting to require Spurwink to comply with Lewiston's stay put obligations.

94. The Stay Put Order exceeded MDOE's lawful authority in holding that Spurwink was subject to the requirements of the IDEA because it is not a "public agency" as defined in the statute or MUSER.

95. Plaintiff therefore seeks prospective injunctive relief vacating the Stay Put Order effective immediately, enjoining any further attempts at enforcement of the Stay Put Order through Order on the Does' Motion to Dismiss or otherwise, and enjoining any placement of Tommy Doe at Spurwink pursuant to the IDEA or MUSER.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor against Defendants and award it:

    a. Declaratory relief that the MDOE administrative proceedings violate Spurwink's constitutional rights;

    b. Declaratory relief that Spurwink is not bound by the Stay Put Order or the stay-put provisions of the IDEA, 20 U.S.C. § 1415(j);

  c. Preliminary or permanent injunctive relief enjoining the enforcement of the Stay Put Order;

  d. Costs, including reasonable attorney fees under 42 U.S.C. § 1988 and any other applicable law; and

  e. Grant such other relief as the Court may deem just and proper.


Dated: January 23, 2025      */s/ Kathleen E. Dion*
               Kathleen E. Dion, Esq. (*pro hac vice* pending)
               Robinson & Cole LLP
               One State Street
               Hartford, CT 06103
               Tel.: (860) 275-8200
               Fax: (860) 275-8299
               Email: kdion@rc.com

               */s/ Tara A. Walker*
               Tara A. Walker, Esq., (Me. Bar No. 5099)
               William Wahrer, Esq., (Me. Bar No. 6179)
               Bernstein Shur Sawyer & Nelson, P.A.
               100 Middle Street
               P.O. Box 9729
               Portland, ME 04104
               Tel.: (207) 774-1200
               Fax: (207) 774-1127
               Email: twalker@bernsteinshur.com
                   wwahrer@bernsteinshur.com


               *Attorneys for Plaintiff Spurwink Services, Inc.*