UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| LEWISTON PUBLIC SCHOOLS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 2:25-cv-00026-JCN |
| | ) | |
| SPURWINK SERVICES, INC., et al., | ) | |
| | ) | |
| Defendants | ) | |

**ORDER ON PENDING MOTIONS**

Plaintiff Lewiston Public Schools (Lewiston) claims that Defendant Spurwink Services, Inc. (Spurwink) violated the Individuals with Disabilities Act (IDEA), 20 U.S.C. §§ 1400 et. seq., and breached its contractual agreement with Lewiston by discharging, outside of the individualized education program (IEP) team process, a student with a disability who previously attended a Spurwink facility for special education services and by refusing to readmit the student during the pendency of the parties' dispute. Through a motion to compel, Lewiston asks the Court to order Spurwink, a private school, to readmit the student and maintain his placement in compliance with the IDEA's "stay put" requirement. (Mot. to Compel, ECF No. 57.) Spurwink opposes the motion (Opp. to Mot. to Compel, ECF No. 64) and has moved to dismiss Lewiston's Second Amended Complaint (SAC) (Mot. to Dismiss, ECF No. 88). Lewiston opposes the motion to dismiss. (Opp. to MTD, ECF No. 90.)

Following a review of the pleadings and after consideration of the parties' arguments, the Court denies Spurwink's motion to dismiss. The Court also grants in part

Lewiston's motion to compel.

## STATUTORY BACKGROUND

### A. The IDEA and Implementing Regulations

Under the IDEA, the federal government provides funds to States "to assist in educating children with disabilities." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017). "In exchange for the funds, a State pledges to comply with a number of statutory conditions. Among them, the State must provide a free appropriate public education—a FAPE, for short—to all eligible children." *Id.* (citing 20 U.S.C. § 1412(a)(1)). FAPE means special education and related services, which must be "provided in conformity with" a student's IEP. 20 U.S.C. § 1401(9)(D). The IEP is "the centerpiece" of the IDEA's "education delivery system for disabled children[.]" *Honig v. Doe*, 484 U.S. 305, 311 (1988), *superseded in part by statute*, 20 U.S.C. § 1415(k)(1)(G); H.R. Rep. No. 105-95, at 108-09 (1997). An IEP "must be drafted in compliance with a detailed set of procedures" which "emphasize collaboration among parents and educators," *Endrew F.*, 580 U.S. at 391, and it must include, among other things, "a statement of the special education and related services . . . to be provided to the child," and the location of those services. 20 U.S.C. § 1414(d)(1)(A)(i)(IV), (VII). The IEP Team, *id.* § 1414(d)(1)(B), must review the child's IEP periodically, and not less frequently than annually, and revise the IEP as appropriate. *Id.* § 1414(d)(4)(A)(i)-(ii).

To receive funds under the IDEA, States must adopt policies and procedures to ensure, among other things, that when the appropriate local educational agency places a

child with a disability in a private school to receive special education and related services in accordance with an IEP, the child receives such services at no cost to the child's parents. 20 U.S.C. § 1412(a)(10)(B)(i). The State educational agency "shall determine whether such schools and facilities meet standards that apply to State educational agencies and local educational agencies and that children so served have all the rights the children would have if served by such agencies." *Id.* § 1412(a)(10)(B)(ii); *see also* 34 C.F.R. § 300.146(c) (reiterating requirement).

A State educational agency that receives funds under the IDEA must also "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of" a FAPE. 20 U.S.C. § 1415(a). The safeguards include "an opportunity to present complaints concerning any aspect of the local agency's provision of" a FAPE and "an opportunity for an 'impartial due process hearing' with respect to such complaints." *Honig*, 484 U.S. at 312. The due process hearing "shall be conducted by the State educational agency or by the local educational agency, as determined by State law[.]" 20 U.S.C. § 1415(f)(1)(A).

A hearing officer's decision in a due process proceeding shall ordinarily be made on substantive grounds based on a determination of whether the child received" a FAPE; in "matters alleging a procedural violation, a hearing officer may find that a child did not receive" a FAPE only if the procedural inadequacies impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding provision of a FAPE, or caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E). When a substantive violation of the IDEA has resulted in the

deprivation of a FAPE, a hearing officer may award relief known as compensatory education, which permits a student to receive special education services for longer than he or she otherwise would have, to make up for the prior deprivation of a FAPE. *See C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 290 (1st Cir. 2008) ("Compensatory education is a surrogate for the warranted education that a disabled child may have missed during periods when his IEP was so inappropriate that he was effectively denied a FAPE."); *Me. Sch. Admin. Dist. No. 35 v. Mr. R.*, 321 F.3d 9, 17-19 (1st Cir. 2003) (acknowledging that a child "eligible for special education services under the IDEA may be entitled to further services, in compensation for past deprivations, even after his or her eligibility has expired" and recognizing that "compensatory education is not an appropriate remedy for a purely procedural violation of the idea").

"Any party aggrieved" by the hearing officer's decision has the right to bring a civil action in State or federal court, seeking relief from the administrative decision. 20 U.S.C. § 1415(i)(2)(A). "The party bringing such action shall have 90 days from the date of the decision of the hearing officer to bring such an action," or such time as State law allows, if State law provides an explicit time limitation for bringing such an action. *Id.* § 1415(i)(2)(B).[1] In such a civil action, the court is empowered to review the administrative

[1] Maine special education law mirrors the civil action provisions of the IDEA, providing "[a]ny party aggrieved by the findings and decision" of a due process hearing officer with the right to bring a civil action seeking judicial review of that decision in State or federal court, so long as such action is filed within 90 days from the hearing officer's decision. Maine Unified Special Education Regulation (MUSER), codified at 05-071 C.M.R. ch. 101 § XVI.19.A-B.

record, take additional evidence at the request of a party, and "grant such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C).

"The 'stay-put' provision at issue in this case governs the placement of a child while these often lengthy review procedures run their course." *Honig*, 484 U.S. at 312. With one exception not implicated here, the stay-put provision directs that "during the pendency of any proceedings conducted pursuant to [§ 1415], unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child[.]" 20 U.S.C. § 1415(j). This subsection is "designed to preserve the status quo pending resolution of administrative and judicial proceedings under the [IDEA]." *Verhoeven v. Brunswick Sch. Comm.*, 207 F.3d 1, 10 (1st Cir. 1999) (quotation marks omitted). "The preservation of the status quo ensures that the student remains in the last placement that the parents and the educational authority agreed to be appropriate." *Id.* This statutory mandate "'has been construed to impose 'an automatic statutory injunction' requiring that the child's then current educational placement be maintained[.]'" *Taylor F. ex rel. Jon F. v. Arapahoe Cnty. Sch. Dist. 5*, 954 F. Supp. 2d 1197, 1200 (D. Colo. 2013) (quoting *Miller v. Alburquerque Pub. Schs.*, 565 F.3d 1232, 1252 n.13 (10th Cir. 2009)); *see also Millay v. Surry Sch. Dept.*, 584 F. Supp. 2d 219, 229 (D. Me. 2008) ("The stay put provision . . . operates against a school as does the automatic stay in bankruptcy . . . against a creditor, who violates it at his or her peril[.]").

**B. Maine Special Education Laws**

In Maine, the Maine Department of Education (MDOE) is responsible for complying with the State's obligations under the IDEA. 20-A M.R.S. § 7006. The MDOE

and every school administrative unit (SAU) "that receives federal or state funds to provide" a FAPE "to children with disabilities" is required to comply with the IDEA and all federal regulations adopted thereunder. *Id.* To satisfy the State's obligations and to comply with parallel requirements under Maine law that "reflect additional procedures . . . to enhance the federal provisions," the MDOE has adopted Maine Unified Special Education Regulation. MUSER § I; *see also* 20-A M.R.S. § 7005 (authorizing the Commissioner of the MDOE to adopt rules necessary to administer Maine's special education statutes). By MDOE rule, special education and related services "may be provided to children with disabilities only by qualified individuals in schools and programs which have been approved by the Commissioner." MUSER § I.3; *see also* 20-A M.R.S. § 7252-A (providing that a special education program may be provided by an approved private school "under the supervision of the [SAU] responsible for the education of the child with a disability enrolled in the program").

In Maine, each SAU is responsible for providing special education "for each eligible child with a disability within its jurisdiction[.]" 20-A M.R.S. § 7202(5); MUSER § IV.4.A. This responsibility extends to children between the ages of 3 and 22 in need of special education, 20-A M.R.S. § 7001(1-B)(B), and includes "all eligible children who attend the public schools" of the SAU "or who attend other public schools or private schools on a tuition or contract basis at public expense." MUSER § IV.4.B; *see also* 20-A M.R.S. § 7251-A (providing that SAUs may contract for the provision of special education services).

An SAU's responsibility for the provision of special education services may be accompanied by financial responsibility for the cost of those services. MUSER § IV.4.A.

In some circumstances, a portion or all the cost "may be borne directly by one or more state agencies, although the provision of special education services remains the responsibility of the SAU." *Id.* As required by 20 U.S.C. § 1412(a)(10)(B), the MDOE has adopted a rule providing that a child with a disability who is placed in a private school by an SAU "is provided special education and related services" in conformity with an IEP at no cost to the child's parents, "and has all the rights of a child with a disability who is served by a public agency." MUSER § IV.4.G(2)(a).[2]

The MDOE has also identified the responsibilities of the sending SAU and a receiving "out-of-unit placement," including a private school, with respect to the revision of an IEP. MUSER § IX.3.I. By rule, the sending SAU "has the administrative responsibility for the education of a child with a disability who has been placed in an out-of-unit placement," like a private school that has "accepted the tuition placement of a child with a disability." *Id.* Among other things, the sending SAU has responsibility for initiating IEP review meetings, annual reviews of the child's IEP and placement, and revision of the IEP. *Id.* The receiving placement is responsible for other matters, including implementing a child's IEP, "which shall not be amended without an IEP Team meeting or the consent of the sending SAU and the parent," and ensuring compliance with MUSER and the IDEA. *Id.*

[2] In implementing these provisions, the State Educational Agency is required to "provide an opportunity" for private schools to which a public agency has referred or placed a child with a disability "to participate in the development and revision of state standards that apply to them." MUSER § IV.4.G(2)(b).

When there is a disagreement regarding the placement of a child with a disability, a parent or SAU may submit a written request for a due process hearing to the MDOE. MUSER § XVI.1.B(3), 5.A(1). MUSER also parallels the IDEA's stay-put provision, providing that "during the pendency of any . . . administrative or judicial proceeding regarding a due process hearing request, . . . unless the Department or SAU and the parents of the child agree otherwise, the child involved in the hearing request must remain in his or her current educational placement." MUSER § XVI.20.A.

On November 24, 2021, the MDOE issued administrative guidance interpreting its own regulations regarding IEP requirements for "out-of-unit" placements. MDOE Administrative Letter No. 28, https://mainedoenews.net/2021/11/24/administrative-letter-iep-requirements-for-out-of-unit-placements/ [https://perma.cc/BN76-8E7Y]. In pertinent part, the letter provided as follows:

> The sending SAU has the administrative responsibility for the education of a student with a disability who has been placed in an out-of-unit placement. Special Purpose Private Schools (SPPS) and other out-of-unit entities must ensure compliance with IDEA, utilizing the IEP team process and maintaining "stay put" in the event of a dispute (34 C.F.R. § 300.518).
>
> The Department is concerned that some . . . SPPS . . . believe that the language of MUSER [IX.3.I] allows a receiving out-of-unit placement to remove a student with a disability from school for any reason, without utilizing the IEP Team process, and without maintaining "stay put" in the event of a dispute. MUSER IX.3.I requires a receiving placement to ensure compliance with "these rules and the Individuals with Disabilities Act." While the Department views this language to cover the requirements for a change of placement, and for stay put, it is clear that some . . . SPPS . . . have not operated with this understanding.
>
> After consulting with counsel, the Department has determined that SPPS and other out-of-unit placements are not in compliance with IDEA when they terminate a student's placement without going through the IEP process.

> Maine will enforce the federal standard of using the IEP process in the change of placement. Effective immediately, [a]ll SAUs must notify the SPPS and out-of-unit placements that in order to continue these placements, they must abide by the federal standard and provide FAPE to eligible students who are placed at SPPS and other out-of-unit placements.

*Id.*

While this case was pending, on June 12, 2026, the MDOE issued an Emergency Rule adding private schools serving as out-of-unit placements as potential parties to due process hearings under MUSER. 05-071 C.M.R. ch. 101 § XVI(1-A) (effective June 12, 2026). As part of the basis statement for the rule, the MDOE described this litigation and its efforts to clarify private schools' obligations to students under the IDEA and Maine law by way of new master contractual agreements and concluded that obstacles remained "primarily due to the continued lack of a regulatory enforcement mechanism." (MDOE Basis Statement & Findings of Emergency at 7, ECF No. 92-1). To prevent the harms described in detail in its findings of emergency, the MDOE amended "MUSER on an emergency basis to include private schools serving as out-of-district educational placements as potential parties to administrative due process hearings." (*Id.* at 9.) In describing the emergency changes to MUSER, the MDOE explained: "Students with disabilities placed in private schools must have the same rights with respect to FAPE – and specifically changes of educational placement and 'stay put' – as students who are placed in public schools." (*Id.*)

## FACTUAL AND PROCEDURAL BACKGROUND[3]

### A. The Parties

In Maine, public school districts and state-approved SPPS operate in concert to serve the needs of special education students with disabilities whose needs cannot be met in a public-school setting. (Lewiston's SAC ¶ 13, ECF No. 87.) Public schools place students at and sometimes pay tuition to private schools to provide special education programming to students. (*Id.* ¶ 14.) In some instances, public schools place students at SPPS and MDOE pays the costs associated with the placement. (*Id.* ¶ 15.)

Lewiston is the municipal school unit responsible for educating students who are residents of Lewiston, Maine. (*Id.* ¶ 2.) Spurwink is a Maine nonprofit corporation that provides behavioral health and education services to children and adults. (*Id.* ¶ 3.) Spurwink operates four SPPS that are approved by the State to provide day treatment services to students with disabilities. (*Id.*) Spurwink receives funding from the State to deliver special education programming to such students. (*Id.*) Spurwink Lewiston Day Treatment is one of the SPPS that Spurwink operates. (*Id.* ¶ 24.)

Defendants Jane and John Doe are the parents and legal guardians of their child, Tommy Doe.[4] (*Id.* ¶ 4.) Tommy, who was twenty years old as of May 2026, qualifies for

---

[3] Unless otherwise indicated, the following facts are drawn from Lewiston's complaint and the exhibits incorporated into the complaint. *See Griffin v. Univ. of Me. Sys.*, No. 2:22-cv-002120-JDL, 2023 WL 5279660, at *3 (D. Me. Aug. 16, 2023) (providing that, in evaluating motion to dismiss under Rule 12(b)(1) and 12(b)(6), a court must accept the well-pleaded facts alleged in the complaint and may also consider documents incorporated into the complaint).

[4] District of Maine Local Rule 16.3(e)(3) contemplates use of a pseudonym for the student in this case, and the Court has permitted the student's parents to proceed with pseudonyms in this matter as well. (Order on Mot. to Proceed Under Pseudonyms, ECF No. 21; Case No. 2:26-cv-00019-JCN, Order on Mot. To Proceed Under Pseudonyms, ECF No. 12.) For avoidance of confusion here, where the parties have used different

special education under the category of autism. (*Id.*) Tommy has several skill deficits caused by autism, including in the area of expressive communication. (*Id.* ¶ 29.) When Tommy is not understood, he becomes frustrated and, as his frustration increases, his behavior deteriorates. (*Id.*) At times, he engages in physical behaviors that are harmful to himself or others. (*Id.*)

**B. Tommy's Attendance at and Discharge from Spurwink**

Tommy began attending Spurwink Lewiston Day Treatment in early 2023 through an arrangement made by a prior school district, as contemplated by his then-current IEP. (*Id.* ¶ 25.) Before accepting him, Spurwink reviewed Tommy's application materials, which would have included Tommy's then-current IEP and special education records. (*Id.*) By accepting Tommy, Spurwink confirmed that it could implement his IEP. (*Id.*)

In June 2024, Tommy moved to a group home in Lewiston, Maine, and became the educational responsibility of Lewiston. (*Id.* ¶ 26.) On July 9, 2024, Lewiston convened an IEP Team meeting to determine Tommy's placement. (*Id.* ¶ 28.) At the meeting, representatives of Lewiston and Spurwink, Lewiston Day Treatment program staff, and Tommy's parents discussed Tommy's educational needs and how best to meet them. (*Id.*) The IEP Team determined that Tommy's behavioral challenges necessitated a highly structured and staff-supported educational environment with clear and consistent expectations and a clinical component. (*Id.* ¶ 30.) The IEP Team agreed to continue Tommy's educational placement at Spurwink: Lewiston approved his placement,

pseudonyms for the student and the student's parents at different times, the Court refers to the student as Tommy Doe, or Tommy, and the student's parents as Jane and John Doe.

Spurwink agreed to implement Tommy's IEP and comply with the IDEA and associated Maine law, and because Tommy was a state agency client, Spurwink was able to bill the MDOE directly for the cost of Tommy's education.[5] (*Id.* ¶¶ 31, 35.) On Spurwink's recommendation, and with Lewiston's agreement, the IEP Team also agreed to amend the IEP to provide a 3:1 staffing model to prevent and respond appropriately to Tommy's behaviors, resulting in additional costs for Tommy's education. (*Id.* ¶ 32.)

In August 2024, Tommy's IEP Team met to conduct its annual IEP review. (*Id.* ¶ 33.) The IEP Team developed a new IEP effective through August 2025 continuing the 3:1 staffing model and making changes to accommodate Tommy's needs. (*Id.*) Tommy's IEP included services specifically designed to support him in using appropriate coping strategies in place of unsafe behaviors and, as the receiving placement, Spurwink was responsible for implementing those services. (*Id.* ¶ 34.)

On November 1, 2024, Tommy bit three Spurwink staff members while transitioning to the school building from outside. (*Id.* ¶ 36.) Spurwink suspended Tommy from school for five days due to the incident. (*Id.*) On November 8, 2024, Lewiston convened an IEP Team meeting that had been scheduled prior to the incident. (*Id.* ¶ 37.) Spurwink announced that it was discharging Tommy from its program effective immediately. (*Id.*) Spurwink did not offer any post-discharge educational programming

[5] Per MUSER § IV.4.E(2)-(3), an SAU is obligated to provide special education services to any state agency client who requires such services and who resides within the geographic jurisdiction of the SAU in a therapeutic group home, but the costs for those services are paid by the MDOE.

or transition plan to readmit Tommy. (*Id.*) The IEP Team did not agree to terminate Tommy's placement at Spurwink, and Lewiston did not amend Tommy's IEP. (*Id.*)

Lewiston disagreed with Spurwink's decision to discharge Tommy and asked Spurwink to readmit him to implement his IEP in compliance with the IDEA's "stay put" requirement. (*Id.* ¶ 39.) Spurwink rejected the request, asserting that its discharge decision was appropriate given the terms of the service agreement executed among Spurwink, John and Jane Doe, and Tommy's prior school district. (*Id.* ¶ 40.) Lewiston never agreed to the service agreement that Spurwink had with Tommy's prior school district. (*Id.* ¶ 41.)

Lewiston convened IEP meetings for Tommy throughout 2025 to discuss efforts to find an alternative placement for Tommy. (*Id.* ¶ 52.) The IEP Team identified four SPPS in Maine that could possibly implement Tommy's IEP. (*Id.* ¶ 44.) Three of those schools had waitlists, and one school determined that it could not meet Tommy's needs. (*Id.*) Ultimately, none of the schools accepted Tommy. (*Id.* ¶ 53.)

**C. Administrative Proceedings at MDOE**

Upon Tommy's discharge, Jane and John Doe immediately challenged Spurwink's decision. (*Id.* ¶ 38.) On November 8, 2024, Jane and John Doe filed a due process hearing request with the MDOE, commencing an administrative action against Lewiston. (*Id.* ¶¶ 6, 38.) Spurwink was not a party in the administrative due process proceeding. Nevertheless, John and Jane Doe filed a motion in the administrative action asking the MDOE to maintain Tommy's placement at Spurwink and enforce "stay-put" relief under the IDEA. (*See* Lewiston's SAC Ex. A, ECF No. 87-1.) In an order dated November 21, 2024 (the Stay Put Order), the MDOE Hearing Officer granted the Does' motion to

maintain placement, reversing Spurwink's "unilateral discharge" of Tommy and ordering "stay put" placement for Tommy at Spurwink. (*Id.*)

After entry of the Stay Put Order, Spurwink did not resume Tommy's placement, and Lewiston moved to dismiss the administrative proceeding, asserting that it had no authority to compel Spurwink to resume Tommy's placement. (*See* Lewiston's SAC Ex. B, ECF No. 87-2.) In an order dated January 17, 2025, the Hearing Officer granted the motion in part, concluding that Spurwink was the party responsible for discharging Tommy without following IDEA procedures and that Lewiston had "met its administrative responsibilities" regarding Tommy under the applicable law by encouraging Spurwink to resume Tommy's placement and by seeking an alternate placement for him. (*Id.*) The Hearing Officer concluded that Spurwink had failed to comply with its obligations under Maine law requiring SPPS to adhere to the IEP process and afford "stay put" protections when modifying a student's placement. (*Id.*) She wrote that Lewiston might be able to compel Spurwink's compliance by way of a breach of contract claim, or the MDOE could possibly coerce compliance by revoking Spurwink's approval as a SPPS. (*Id.*) The Hearing Officer also ordered Lewiston to ensure Tommy is provided with compensatory education pursuant to his IEP for services not received from the date of his discharge from Spurwink until his subsequent placement elsewhere. (*Id.*)

In August 2025, Lewiston filed a motion seeking to add Spurwink as a defendant in the administrative proceeding. (Lewiston's SAC Ex. C, ECF No. 87-3.) In response, Spurwink argued it was exempt from the Hearing Officer's jurisdiction. (*Id.*) The Hearing Officer agreed, and issued an order on September 17, 2025, concluding that she lacked

jurisdiction to add Spurwink as a party. (*Id.*) On October 17, 2025, the Hearing Officer entered an order clarifying the compensatory education remedy previously ordered. (Lewiston's SAC Ex. D, ECF No. 87-4.) The Hearing Officer directed Lewiston to ensure that Tommy is provided with compensatory education for services not received from the date of his discharge from Spurwink until his subsequent placement elsewhere, or his 22nd birthday, whichever occurs first. (*Id.*) At that point, the Hearing Officer closed the proceedings, concluding there was no need for a factual hearing, as there was no factual dispute between the parties. (*Id.*)

**D. Procedural History of this Case**

Spurwink commenced this action by filing a complaint naming as defendants, John and Jane Doe, Tommy, Lewiston, the MDOE, the MDOE Commissioner, and the MDOE Hearing Officer assigned to the administrative proceeding. (Spurwink's Compl., ECF No. 1.) Spurwink sought a preliminary injunction to enjoin the Stay Put Order on due process grounds and to declare that MUSER § IX.3.I conflicts with federal law. (Mot. for Prelim. Inj., ECF No. 8.) The Court denied the motion, concluding that Spurwink had not established a likelihood of success on (a) its claim that the Stay Put Order violated Spurwink's due process rights or (b) its claim that MUSER § IX.3.I conflicts with the IDEA. (Order on Mot. for Prelim. Inj., ECF No. 45.) As to the due process claim, the Court observed that the Hearing Officer's Stay Put Order was not self-enforcing, the MDOE had not taken steps to enforce the Stay Put Order, and there was no "evidence of any pending judicial enforcement action." (*Id.* at 11.) Thereafter, the litigation was stayed for a time to permit the MDOE to attempt to clarify private schools' obligations to students

under the IDEA and Maine law by way of new master contractual agreements between the MDOE and SPPS under 20-A M.R.S. § 7252-A.

While the stay of Spurwink's case was in effect, Lewiston filed a complaint, naming Spurwink and Jane and John Doe as defendants. (Case No. 2:26-cv-00019, Lewiston's Compl., ECF No. 1.) The two related cases were subsequently consolidated under Docket No. 2:25-cv-00026-JCN. (Order on Mots. to Consolidate, ECF No. 56.) Subsequently, Spurwink voluntarily dismissed its complaint, (Notice of Dismissal, ECF No. 82), and the Court issued a procedural order captioning this case *Lewiston Public Schools v. Spurwink Services, Inc., et al.* (Procedural Order, ECF No. 86.)

## LEGAL STANDARD

To survive a motion to dismiss, a complaint "must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013) (quotation marks omitted). When evaluating the adequacy of a complaint, a court disregards "statements in the complaint that simply offer legal labels and conclusions" and credits, as true, the complaint's non-conclusory allegations of fact. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). "To allege a civil action in federal court, it is not enough for a plaintiff merely to allege that a defendant acted unlawfully; a plaintiff must affirmatively allege facts that identify the manner in which the defendant subjected the plaintiff to a harm for which the law affords a remedy." *Wells Fargo Bank N.A. v. Hightower*, No. 2:21-cv-00302-JDL, 2022 WL 444450, at *2 (D. Me. Feb. 14, 2022).

## DISCUSSION

### A. Spurwink's Motion to Dismiss

In its complaint, as amended, Lewiston seeks (I) judicial review of portions of the MDOE Hearing Officer's orders that were adverse to Lewiston; (II) an order requiring Spurwink to readmit Tommy under the "stay put" provision of the IDEA; (III) a declaratory judgment that Spurwink (a) violated the IDEA and Maine law by discharging Tommy without following the IEP process and by refusing to readmit Tommy during the pendency of the parties' dispute, and (b) is responsible for remedying that violation; and (IV) a judgment that Spurwink breached the parties' alleged contractual agreement regarding Tommy's education at Spurwink.

#### 1. Count IV: Breach of Contract

Lewiston asserts that Spurwink and Lewiston entered into an unwritten contract when they agreed to continue Tommy's placement at Spurwink in 2024, and that their agreement contemplated Spurwink's compliance with the IDEA and related Maine law. In Count IV of its complaint, Lewiston claims that Spurwink breached the alleged agreement by unilaterally discharging Tommy and refusing to readmit him after the Does invoked Tommy's "stay put" rights. Lewiston seeks a declaration that Spurwink is responsible for remedying the violation of Tommy's IDEA rights by providing compensatory education, and an order requiring Spurwink to compensate Lewiston for compensatory and consequential damages, including Lewiston's attorneys' fees.

To plead a plausible breach of contract claim, a plaintiff must allege the existence of an agreement with the defendant, the defendant's breach of a material term of the

agreement, and that the breach caused the plaintiff damages. *Boyne USA Inc. v. Starr Surplus Lines Ins. Co.*, No. 2:24-cv-00247, JAW, 2025 WL 358917, at *11 (D. Me. Jan. 31, 2025). The first element, existence of an agreement, requires "an offer, acceptance of that offer, a meeting of the minds and consideration." *Suzman v. Crisp*, 489 F. Supp. 2d 103, 107 (D. Me. 2007).

According to Spurwink, the breach of contract claim fails. Spurwink argues that the breach of contract claim is barred by Lewiston's failure to allege adequate consideration. Spurwink contends that Lewiston's approval of Tommy's placement at Spurwink did not constitute adequate consideration to form a contract between Lewiston and Spurwink because Lewiston's approval simply satisfied Lewiston's independent duty to provide Tommy with a FAPE. Spurwink also contends that the claim fails because the damages Lewiston seeks are not recoverable. Spurwink asserts that compensatory education is not available as a remedy against a private school, and Maine law does not permit an award of attorney fees in a breach of contract action in the absence of a provision in the contract providing otherwise. Spurwink further argues that the claim is barred by Maine's statute of frauds, 33 M.R.S. § 51, because the alleged agreement between the parties contemplated performance outside of one year and was not reduced to writing. Finally, Spurwink contends that public policy supports dismissal of Count IV: it insists there would be "far-reaching and disastrous" consequences should an IEP be treated as a binding agreement between a SAU and a SPPS that "creates an interminable obligation to continue educating the student until relieved of that obligation by the SAU." (Mot. to Dismiss at 16.)

Lewiston argues that its agreement to place Tommy at Spurwink provided benefit to Spurwink because that agreement permitted Spurwink to bill the State for Tommy's placement. Lewiston acknowledges that it had a duty to provide Tommy with a FAPE, but it maintains that it had no obligation to place Tommy at Spurwink, and that the placement agreement and concomitant benefit to Spurwink amount to consideration. As for damages, Lewiston asserts that it could conceivably recover the costs of compensatory education and attorney fees foreseeably caused by the breach. Regarding the statute of frauds, Lewiston asserts that Spurwink's agreement to implement Tommy's IEP expressly contemplated performance within a year, as every IEP is subject to annual review and revision under 20 U.S.C. § 1414(d)(4)(A)(i). Finally, Lewiston contends that the consequences of its contract claim will not generate the public policy concerns that Spurwink cites, as the alleged agreement was not interminable.

Spurwink's contention that Lewiston failed to plead consideration is unconvincing. That Lewiston had a pre-existing legal obligation to provide a FAPE to Tommy is no bar to the alleged agreement, despite the so-called pre-existing duty rule. The rule provides that the performance "of a legal duty owed to a promisor which is neither doubtful nor the subject of honest dispute is not consideration; but a similar performance is consideration if it differs from what was required by the duty in a way which reflects more than a pretense of bargain." Restatement (Second) of Contracts § 73; *see also In re Lloyd, Carr & Co.*, 617 F.2d 882, 890 (1st Cir. 1980) (adopting similar formulation and recognizing the underlying policy: "to discourage parties under such a duty from using the threat of nonperformance to extort greater compensation for doing only that which they were

already obligated to do"). "The performance of a legal duty is not consideration for a promise . . . if the duty is owed to the promisor" as when a public official bargains to obtain private advantage for performance of an official duty. Restatement (Second) of Contracts § 73 cmt. b. But where the duty in question is not owed to the promisor, a bargain concerning the fulfillment of that duty is not necessarily lacking in consideration. *See id.*

Here, Lewiston had a duty under the IDEA and Maine law to provide Tommy with a FAPE, but Lewiston had no obligation to implement that duty by placement of Tommy at Spurwink. Lewiston's agreement to continue Tommy's placement at Spurwink was made to fulfill Lewiston's obligation to Tommy, in exchange for Spurwink's legally enforceable right to payment from the State for special education services provided to Tommy, a state agency client. This exchange, a modification of legal relations bargained for by Spurwink and Lewiston, does not implicate the pre-existing duty rule, and it amounts to sufficient consideration to support a contract between Spurwink and Lewiston. *See* Restatement (Second) of Contracts § 71 cmt. d ("Not infrequently the consideration bargained for is an act with the added requirement that a certain legal result shall be produced."); *id.* cmt. e ("It matters not from whom the consideration moves or to whom it goes. If it is bargained for and given in exchange for the promise, the promise is not gratuitous.").

With respect to damages, the Court is unpersuaded by Spurwink's argument that Lewiston is necessarily barred from recovering the costs of education services that Tommy did not receive as a measure of damages. The two cases that Spurwink cites in its opposition are distinguishable. In *Smith v. James C. Hormel School of Virginia Institute*

*of Autism*, No. 3:08-CV00030, 2010 WL 1257656 (W.D Va. Mar. 26, 2010), where a student's parents sued a private school directly seeking an award of compensatory education as a remedy for breach of contract, the court denied the parents' motion for summary judgment on the breach of contract claim, concluding that they had failed, more than two years into the suit, to quantify the value of the compensatory education they sought, and they could not recover the costs of such education from a private school. *Id.* at *15. There is no suggestion that Lewiston will be unable to quantify the cost of providing the compensatory education to Tommy. *Miksis v. Evanston Township High School District # 202*, 235 F. Supp. 3d 960 (N.D. Ill. 2017), which also involved a breach of contract claim by a student's parents, undermines Spurwink's argument to some extent. In that case, the court concluded that although compensatory education was "only available under IDEA," it was likely, under a contract measure of damages, that the parents "would be able to recover the reimbursements they [sought] for costs and expenses," including "tuition expenses." *Id.* at 986-87.

In this case, Tommy's parents have recovered an award of compensatory education against Lewiston. The Court is not prepared at this stage to conclude that Lewiston cannot recover the costs, if any, that it incurs in providing the compensatory education.

The statute of frauds is also not a bar to the breach of contract claim at this stage. A contract falls within Maine's statute of frauds, 33 M.R.S. § 51, "if the parties plainly manifested an intent that the contract was not to be performed within one year." *Roger Edwards, LLC v. Fiddes & Son, Ltd.*, 245 F. Supp. 2d 251, 258 (D. Me. 2003). For "dismissal to be allowed on the basis of an affirmative defense," like the statute of frauds,

"the facts establishing the defense must be clear on the face of the plaintiff's pleadings." *Blackstone Realty LLC v. F.D.I.C.*, 244 F.3d 193, 197 (1st Cir. 2001) (quotation marks omitted). Viewing the pleadings in the light most favorable to Lewiston, as the non-moving party, the Court cannot conclude that the pleadings establish that the parties plainly manifested an intention that their agreement was not to be performed within one year. Instead, it is conceivable that the parties intended their agreement to last one year, until the next annual review of Tommy's IEP. Regardless, because the complaint "fails to remove all doubt" that Plaintiff's claim is barred by the statute of frauds, the claim survives this challenge. *See Fitzpatrick v. Teleflex, Inc.*, 630 F. Supp. 2d 91, 94 (D. Me. 2009) (denying motion to dismiss based on statute of frauds).

The Court is also not persuaded by Spurwink's public policy argument. Under Maine law, a contract is "against public policy if it clearly appears to be in violation of some well established rule of law," or has a tendency that "will be harmful to the interests of society." *Court v. Kiesman*, 850 A.2d 330, 333 (Me. 2004). As Spurwink argues, courts have concluded that an IEP is not a contract between a student's parents and a school district. *See, e.g.*, *Ms. K. v. S. Portland*, 407 F. Supp. 2d 290, 301 (D. Me. 2006). But there is no "well established rule of law" that an agreement regarding the implementation of an IEP between a school district and a private school cannot reasonably be viewed as an enforceable agreement. On balance, in the Court's view, the enforcement of the agreement

does not clearly appear to violate an established rule of law, nor would it harm the interests of society. For all of these reasons, Count IV survives Spurwink's motion to dismiss.[6]

**2. Counts I & II: Judicial Review and Stay Put Relief**

In Count I of its complaint, Lewiston asks the Court to reverse or vacate the Hearing Officer's determinations that (a) Spurwink could not be added as a party to the administrative proceeding and (b) Lewiston is responsible for providing compensatory education to Tommy. In Count II, Lewiston requests a "stay put" order requiring Spurwink to readmit Tommy to its program.[7] Spurwink urges dismissal of these claims for several reasons. Spurwink argues that Lewiston's request for judicial review is time-barred. Spurwink also makes a threshold due process challenge: Spurwink contends that because it was not a party to the administrative proceeding, there can be no judicial review of that proceeding in which Spurwink is a defendant. As discussed below, the claims survive both challenges.

***a. Statute of Limitations***

Citing 20 U.S.C. § 1415(i)(2)(B) and MUSER § XVI.19.B, Spurwink argues that Lewiston's request for judicial review is untimely because the request was not filed within 90 days of the relevant Hearing Officer's decision on September 17, 2025, denying

---

[6] Spurwink also raises judicial estoppel as a bar to the breach of contract claim, alleging that Lewiston has taken inconsistent positions regarding the existence of a contract between the parties. (Mot. to Dismiss at 11-12 n.3.) However, Spurwink has not established that the Court accepted Lewiston's prior representations regarding the absence of a written contract. *See Perry v. Blum*, 629 F.3d 1, 11 (1st Cir. 2010) ("The party proposing an application of judicial estoppel must show that the relevant court actually accepted the other party's earlier representation."). Consequently, judicial estoppel is not implicated.

[7] Lewiston also seeks this same relief by way of its motion to compel.

Lewiston's motion to join Spurwink as a party. Spurwink contends that the limitations period commenced with the September 17 decision because that decision addressed the relief Lewiston requested against Spurwink.

Lewiston counters that the law contemplates a single, final decision by a hearing officer in an administrative due process hearing, and that the statute of limitations under the IDEA and MUSER does not begin to run until that single, final decision is rendered. Lewiston asserts that the Hearing Officer's final, substantive decision was issued on October 17, 2025, when the Hearing Officer fixed the compensatory education remedy and closed the proceeding, and that Lewiston's complaint was filed timely, within 90 days of that decision. Lewiston also contends that neither the IDEA nor Maine law contemplates "interlocutory rulings triggering separate appeal periods." (Opp. to MTD at 6.) Both parties cite case law in support of their respective positions.

Like the court in *A.H. ex rel. D.H. v. Nampa School District No. 131*, 1:25-cv-489-BLW, 2026 WL 265445 (D. Idaho Jan. 30, 2026), this Court finds the decisions that Spurwink cites—namely *Paul G. v. Monterey Peninsula Unified School District*, 256 F. Supp. 3d 1064, 1072 (N.D. Cal. 2017) and *B.B. v. Tacoma School District*, No. 08-5512 RJB, 2009 WL 159204 (W.D. Wash. Jan. 22, 2009)—unpersuasive to the extent the decisions might suggest that 20 U.S.C. § 1415(i)(2)(B) can be read to permit multiple, piecemeal appeals from interlocutory decisions issued during the course of a due process proceeding. Moreover, in the Court's view, neither of the decisions stands for that proposition: in both cases, the courts evidently considered a dismissal order issued in the administrative proceeding as the final order for statute of limitations purposes where that

dismissal order effectively ended the proceeding. *See Paul G.*, 256 F. Supp. 3d at 1072 ("If the 90-day window were to be calculated from the dismissal of the whole case . . . the instant action would still be untimely."); *B.B. v. Tacoma*, 2009 WL 159204, at *3 ("The Plaintiffs filed their complaint with this Court on August 21, 2008, over six months after the due process hearing complaint was dismissed.").

A plain reading of the pertinent statutes and regulations supports Lewiston's position. The relevant statute refers to a single due process hearing resulting in a single decision which "shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education." 20 U.S.C. § 1415(f)(3)(E)(i). Subsection (f) of the statute "'concerns due process hearings, and the only decision contemplated by the plain meaning of that subsection is the decision following the due process hearing.'" *Jackson Twp. Bd. of Educ. v. S.G. ex rel. A.G.*, No. 16-0336-BRM-DEA, 2017 WL 1065819, at *4 (D.N.J. Mar. 21, 2017) (quoting *M.M. v. Lafayette Sch. Dist.*, 681 F.3d 1082, 1087 (9th Cir. 2012)). The statutory right to bring a civil action for judicial review provides that right to a "party aggrieved by the findings and decision" made following the due process hearing under section 1415(f). 20 U.S.C. § 1415(i)(2)(A).[8] The statute "does not contemplate interlocutory rulings triggering separate appeal periods." *A.H. v. Nampa*, 2026 WL 265445, at *3. Instead, the statutory text is best read as "establish[ing] a unitary administrative process culminating in a single decision subject to

[8] Section 1415(i)(2)(A) also provides a right to bring a civil action to any party "aggrieved by the findings and decision made under" section 1415(k), but that provision is not implicated here.

judicial review." *Id.*; *see also M.L. ex rel. B.L. v. Frisco Indep. Sch. Dist.*, 451 Fed. Appx. 424, 426 (5th Cir. 2011) ("There is no statutory provision for a suit seeking interlocutory review of preliminary findings and decisions of the hearing officer."); *Jackson Twp.*, 2017 WL 1065819, at *3 (finding that "the IDEA does not provide federal courts with jurisdiction over appeal of a pre-hearing decision, related to a strictly procedural issue"); *Lake Wash. Sch. Dist. No. 414 v. Off. of Superintendent of Pub. Instruction*, No. C09-5009 RBL, 2009 WL 959818, at *5 (W.D. Wash. April 8, 2009) ("The IDEA does not permit a plaintiff, allegedly aggrieved by a pre-hearing order, to file a complaint in federal court while administrative proceedings are still pending and seek the functional equivalent of an interlocutory appeal.").

Treating the order entered upon conclusion of the administrative proceeding as the final order for the commencement of the limitations period also furthers important interests in achieving consistency and finality and avoiding the prospect of piecemeal review. *See generally Komninos by Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 778-79 (3d Cir. 1994) (interpreting judicial review provision of IDEA formerly located in 20 U.S.C. § 1415(e)(2) to require the parties to "complete the administrative process before resorting to federal court" based, in part, on concerns about consistency and procedural efficiency that would be hampered by premature judicial intervention in administrative proceedings that were designed to permit "state and local agencies to exercise discretion and expertise in fields in which they have substantial experience" and to develop a complete factual record).

Finally, case law from the Court of Appeals for the First Circuit supports Lewiston's position. In assessing who has statutory standing as a party "aggrieved" under the IDEA, the First Circuit has signaled that the right to bring a civil action provided by 20 U.S.C. § 1415(i)(2) is accorded to a party "'aggrieved by the findings and decision made [in the final stage of the due process hearings][.]'" *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 115 (1st Cir. 2003) (brackets and bracketed language in original). In evaluating when the limitations period for judicial review accrued, the First Circuit employed rules of reasonableness and declined to adopt a rule requiring plaintiffs to bring suit "before they had suffered the injury that is the basis for their claims." *Id.* at 119. Here, one of Lewiston's alleged injuries is the compensatory remedy that was modified in the Hearing Officer's final order in October 2025. Reason suggests that Lewiston would have to wait until the entry of that order to seek judicial review of that alleged harm. Lewiston's IDEA claims, which were filed within 90 days of the October 2025 order, are not time-barred.

***b. Constitutional Due Process***

Spurwink also raises a constitutional due process challenge to Counts I and II. (*See* Opp. to Mot. to Compel at 8.)[9] Spurwink contends that its constitutional due process rights would be infringed if it were required to maintain Tommy's placement without the opportunity to participate in the administrative due process proceeding.

[9] Although Spurwink raised this challenge in response to the motion to compel, the Court addresses it here, in the context of the motion to dismiss because the Court previously permitted a degree of consolidated briefing on the two motions (*see* Order, ECF No. 60), and has consolidated the motions for decision.

Because Lewiston qualifies as a "party aggrieved" by the Hearing Officer's order, this action is properly before this Court under 20 U.S.C. § 1415(i)(2)(A), regardless of Spurwink's status as a non-party to the administrative proceeding. The Court understands Spurwink's due process concerns, but is not persuaded that Counts I and II are subject to dismissal based on due process principles.

Spurwink has not demonstrated at this stage of the proceedings that the Hearing Officer's Stay Put Order or any other ruling that Lewiston asks the Court to review constitutes a government seizure of a constitutionally protected interest in liberty or property. *See Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 7 (1st Cir. 2005) ("To the extent that [a party] hope[s] to maintain a procedural due process claim, they must first point to a protected liberty or property interest.").

To establish a protected liberty interest, a party must point to "'a right or status previously recognized by state law [that] was distinctly altered or extinguished' by state action." *Id.* at 8 n.4 (quoting *Paul v. Davis*, 424 U.S. 693, 711 (1976)). To establish a protected property interest, a party must point to a "'legitimate claim of entitlement'" to certain property, "a claim of entitlement created and defined by 'existing rules or understandings that stem from an independent source such as state law.'" *Id.* at 8 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Spurwink has not identified a protected liberty interest altered or extinguished by state action: the record does not reflect that MDOE has taken any action to revoke Spurwink's status as a SPPS or otherwise threatened Spurwink's receipt of state funding for the education of disabled students. For a property interest, Spurwink claims that it had a right to discharge Tommy recognized by state law,

a right infringed by the Hearing Officer's Stay Put Order. As explained elsewhere in this decision, this view is not consistent with MUSER § IX.3.I and the MDOE's interpretation of that regulation.

Furthermore, even if Spurwink had shown a constitutionally protected interest infringed by the Hearing Officer's Stay Put Order, neither the alleged facts nor any other information of record demonstrates a lack of process. First, Spurwink could have attempted to intervene in the administrative proceeding commenced by Tommy's parents, and it could have filed a civil action in state or federal court if its request for intervention was denied. 20 U.S.C. § 1415(i)(2). Instead, when Lewiston attempted to join Spurwink in the administrative proceeding, Spurwink resisted Lewiston's efforts. Spurwink also could have asked Lewiston to suspend Tommy for up to 10 school days following the incident that led to his discharge, *id*. § 1415(k)(1)(B), asked Lewiston to remove Tommy to an interim alternative educational setting for up to 45 school days based on Tommy's infliction of serious bodily injury to others while at school, *id.* § 1415(k)(1)(G)(iii), requested an IEP meeting, or requested a due process hearing regarding Tommy's placement if Spurwink believed that maintaining Tommy's placement was substantially likely to result in injury to Tommy or to others, *id.* § 1415(k)(3)(A). Spurwink could also have asked a court for special relief from maintenance of the current placement during the pendency of the IDEA proceedings. *See Honig*, 484 U.S. at 327-28.[10] Instead, Spurwink

---

[10] This procedural mechanism provides potential relief from the consequence of the "stay-put" provision that the petitioner in *Honig* deemed untenable: "that school districts must return violent or dangerous students to school while the often lengthy [administrative and judicial] proceedings run their course." *Honig*, 484 U.S. at 323. In a similar vein, Spurwink urges the Court not to construe MUSER to impose the IDEA's "stay put" obligation on private schools. It says: "For special-purpose private schools serving

availed itself of this Court's jurisdiction when it filed its complaint challenging the Hearing Officer's Stay Put Order on due process grounds. To the extent that due process was lacking in the administrative proceeding, constitutionally adequate process was afforded by the prospect of judicial review in state or federal court, and any alleged shortcoming has been effectively remedied by Spurwink's participation in this proceeding.

In sum, Counts I and II survive the motion to dismiss to the extent that the motion is grounded in the statute of limitations and constitutional due process principles.

### *c. Cause of Action or Remedy Against Private School*

Spurwink also contends that Counts I and II fail to state actionable claims because there is no cause of action available for judicial review and "stay put" relief against a private school. Spurwink's argument, therefore, is that as a SPPS, it is an improper party to Lewiston's request for judicial review of the administrative decision in accordance with 20 U.S.C. § 1415(i)(2)(A). As part of its request for judicial review, Lewiston challenges the Hearing Officer's decision denying Lewiston's request to join Spurwink in the administrative proceeding, a request to which Spurwink objected during the administrative proceeding. Because Lewiston seeks review of a decision regarding Spurwink's joinder in the administrative proceeding and because Spurwink participated in the process that

---

students with significant behavioral or emotional disabilities, an indefinite obligation to continue educating a student after it is clear the placement is no longer appropriate is not just burdensome but is unsafe and untenable." (Opp. to Mot. to Compel at 9.) Spurwink has not, however, established that the placement is no longer appropriate and it is not empowered to do so unilaterally. That is precisely why the "stay put" requirement was included in the IDEA. *See Honig*, 484 U.S. at 323 (concluding that Congress created "stay put" obligation to "strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school").

resulted in the decision, Spurwink is a proper party to Lewiston's request for judicial review in Count I.

As to Count II, Spurwink's contention that there is no separate cause of action for a "stay put" order might have some merit (setting aside, for the moment, the question of whether a SPPS may be subject to the "stay put" obligation). The request is arguably subsumed in the request for judicial review. The Court, however, does not have to resolve the issue because the question of whether a "stay put" order is appropriate is properly before the Court. The "stay put" requirement is "'designed to preserve the status quo pending resolution of challenge proceedings under the IDEA.'" *Doe v. Portland Public Schools*, 30 F.4th 85, 91 (1st Cir. 2022) (quoting *Verhoeven*, 207 F.3d at 3.) The requirement, therefore, is typically viewed as a request for preliminary relief in connection with a party's request for judicial review rather than as a separate cause of action. In other words, "the stay put provision generally operates as an 'automatic preliminary injunction.'" *Portland Public Schools v. Doe*, No. 2:26-cv-00137-JAW, 2026 WL 2546595, at *8 (D. Me. Aug. 28, 2026) (quoting *Zvi D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982)). The Court will address the parties' "stay put" arguments in the context of Lewiston's motion to compel Spurwink to maintain Tommy's placement with Spurwink. [11]

[11] In Count III of its complaint, Lewiston seeks a declaratory judgment that Spurwink violated the IDEA, Maine law, and its agreement with Lewiston by discharging Tommy outside of the IEP Team process and by refusing to readmit Tommy during the pendency of this dispute. Lewiston asks the Court to find that Spurwink is responsible for remedying the violation of Tommy's IDEA rights. Spurwink argues that the claim fails because it is not predicated on a timely or viable cause of action. Contrary to Spurwink's contention, for the same reasons that Counts I, II, and IV survive the motion to dismiss, Lewiston has asserted an actionable claim for declaratory judgment.

### B. Lewiston's Motion to Compel

Lewiston argues that the IDEA's "stay put" mandate is imposed upon Maine special purpose private schools by state statute, specifically 20-A M.R.S. § 7501, and by state regulation, specifically MUSER § IX.3.I. Spurwink replies that MUSER § IX.3.I does not expressly or by implication impose a "stay put" mandate upon Maine SPPS. Spurwink also argues that to the extent any "stay put" obligation existed, that obligation terminated under the terms of 20 U.S.C. § 1415(j) when the due process proceedings, commenced by the Does against Lewiston, were completed and closed by the MDOE Hearing Officer in October 2025. (Opp. to Mot. to Compel at 4.)

As this Court previously observed, the IDEA does not impose legal duties on private schools. (Order on Mot. for Prelim. Inj. at 12.) Instead, the IDEA contemplates that some students will be placed in private schools by the state or local educational agency as a means of complying with the statute and charges the state or local educational agency with "determining whether private schools meet standards applicable to public schools," (*id.*), and ensuring that students who attend private school have all the rights they would have if they attended public school. *See* 20 U.S.C. § 1412(a)(10)(B)(ii); 34 C.F.R. § 300.146(c). There is no dispute that a state educational agency could permissibly require private schools to comply with placement protections as a means of ensuring that students with disabilities who are placed in a private school by a public agency have all the rights they would have if they attended public school. The Court previously determined as much, and the parties do not challenge that determination. (*See* Order on Mot. for Prelim. Inj. at 18; Opp. to Mot to Compel at 2.)

Federal law incorporates state standards, substantive and procedural, into the definition of FAPE. 20 U.S.C. § 1401(9)(B). "Thus, a district court's inquiry" in an IDEA case must include an evaluation of whether state law "exceeds the protection and services required by the federal Act." *Town of Burlington v. Dept. of Educ. of Mass.*, 736 F.2d 773, 789 (1st Cir. 1984). "If it does, the state standard will operate to determine what an appropriate education requires for a particular child in a given state." *Id.* The question presented by the motion to compel is whether Maine law requires Spurwink to readmit Tommy during the pendency of the dispute concerning Tommy's placement.

Under Maine law, the Commissioner of the MDOE "may require that special education programs in an approved private school . . . receiving state funds comply with rules for the conduct of programs within public schools." 20-A M.R.S. § 7501. The Commissioner has done that, promulgating a regulation enumerating the responsibilities of a SPPS when it comes to revision of an IEP: the SPPS is required to ensure "compliance with these rules"—i.e., MUSER—and the IDEA. MUSER § IX.3.I. As Lewiston notes, the "stay put" mandate is a central aspect of the IDEA's protections for special education students. *See Doe v. Brookline*, 722 F.2d 910, 915 (1st Cir. 1983) ("By its enactment of [the stay-put requirement], Congress indicated that despite an ongoing IEP conflict, consistency in a disabled child's education is highly important."). Given the importance of the provision to the overall statutory scheme, and the separate requirement that states implement procedures to ensure that private school students have all the protections they would have if they attended public schools, MUSER § IX.3.I is best read to apply the "stay put" requirement to SPPS, like Spurwink. This construction of MUSER is also consistent

with the guidance issued by MDOE in 2021 which expressly advised that, under MUSER § IX.3.I, SPPS are obligated to maintain "stay put" in the event of a dispute. Spurwink accepted Tommy in 2023, following publication of the 2021 guidance from MDOE, and it has offered no compelling reason to reject the MDOE's interpretation of its rules. Because state law requires Spurwink to comply with the IDEA and its "stay put" obligation, that requirement is incorporated into the federal FAPE standard.

"Stay put" is designed to maintain the status quo pending resolution of administrative and judicial proceedings under the IDEA, particularly when the proceedings concern a student's placement. This action for judicial review is a continuation of the proceedings conducted under 20 U.S.C. § 1415, such that the "stay put" requirement remains. *See* 34 C.F.R. § 300.518 (providing generally that "during the pendency of any administrative or judicial proceeding regarding a due process complaint notice requesting a due process hearing . . . unless the State or local agency and the parents of the child agree otherwise, the child involved in the complaint must remain in his or her current educational placement"); MUSER § XVI.20.A (same). The First Circuit recognized the continuing nature of the "stay put" obligation when it wrote:

> Nothing in the "stay put" provision limits the availability of "stay put" injunctions to the duration of the administrative hearings. . . . [S]ection 1415(j) provides for "stay put" placement "during the pendency of any proceedings conducted pursuant to this section." Because "this section—section 1415—makes available both administrative proceedings and judicial actions to appeal the administrative determination, subsection 1415(j)

> provides for "stay put" placement throughout both the administrative and judicial proceedings challenging a placement decision.

*Verhoeven*, 207 F.3d at 6. Under the First Circuit's analysis, Spurwink's contention that any "stay put" obligation ended when the Hearing Officer closed the administrative proceeding is unavailing.

This case, however, is not typical of the cases in which "stay put" is requested. The "stay put" requirement or a "stay put" order would ordinarily maintain a student's placement with little or no interruption. In this case, there is no opportunity to maintain a relatively uninterrupted placement, which is what the "stay put" requirement is designed to accomplish. Under the circumstances, the Court believes that an assessment of whether the objectives of the "stay put" requirement and Tommy's best interests would be served by a "stay put" order is necessary before the Court could reasonably consider a "stay put" order directing Spurwink to readmit Tommy.

In *Honig*, the Supreme Court determined that the "stay put" provision "says nothing whatever about judicial power" and does not limit a court's equitable authority. *Honig*, 484 U.S. at 327. In the exercise of its equitable authority, as explained below, the Court will deny without prejudice Lewiston's request for an order directing Spurwink to readmit Tommy immediately and will require Lewiston to convene an IEP Team meeting to assess whether Spurwink, or another program, is currently an appropriate placement for Tommy.

## CONCLUSION

Following a review of the relevant pleadings, and after consideration of the parties' arguments, the Court denies Spurwink's motion to dismiss. On Lewiston's motion to

compel, the Court finds that Spurwink, as a SPPS, is subject to the IDEA's "stay put" obligation. In that way, the Court grants in part Lewiston's motion to compel. The Court denies without prejudice Lewiston's request for an order directing Spurwink to readmit Tommy immediately. The Court orders that Lewiston shall convene an IEP Team meeting, which shall involve Spurwink, to assess Tommy's current needs and whether Spurwink, or another program, is an appropriate placement for Tommy. On or before October 30, 2026, the parties shall file a report on the status of the IEP process. Upon review of the report, the Court will determine the future course of the proceedings regarding Lewiston's request for a "stay put" order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 19th day of October, 2026.